**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAUL LINNEY, | : | |
| | : | |
| Appellant | : | No. 1601 EDA 2017 |

Appeal from the Judgment of Sentence April 14, 2017
in the Court of Common Pleas of Montgomery County,
Criminal Division at No(s):  CP-46-CR-0006608-2016

BEFORE:  BOWES, J., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:           **FILED FEBRUARY 27, 2018**

Paul Linney ("Linney") appeals from the judgment of sentence imposed following his convictions of driving under the influence ("DUI") – general impairment, DUI – highest rate, and harassment.  **See** 75 Pa.C.S.A. § 3802(a)(1), (c); 18 Pa.C.S.A. § 2709(a)(4).  We affirm.

In its Opinion, the trial court has set forth an extensive recitation of the factual and procedural history, which we adopt for the purpose of this appeal.  **See** Trial Court Opinion, 7/7/17, at 1-12.

On appeal, Linney raises the following questions for our review:

I.     Did the [trial] court erroneously preclude the defense from introducing photographs depicting the injuries sustained by [Linney] during his 2012 arrest, where: (1) the photos were probative of the affiant officer's credibility, and (2) the true extent of [Linney's] prior injuries was relevant to substantiate [Linney's] testimony that, during the ensuing 2016 incident, he acted out of fear and anger but without a specific intent to harass?

II. Was the evidence insufficient to make out the necessary elements of the crime of harassment, where the evidence did not establish that [Linney] engaged in any of the behaviors proscribed by 18 Pa.C.S.[A.] § 2709 with the intent to harass, annoy or alarm the complainant[?]

Brief for Appellant at 5.

In his first claim, Linney contends that the trial court abused its discretion in not allowing the admission of photographs depicting Linney's injuries after his 2012 arrest. *Id.* at 11. Linney argues that the photographs were relevant to attack the credibility of Officer Thomas Nyman ("Officer Nyman"). *Id.* at 11, 14; *see also id.* at 11 (wherein Linney claims that the evidence would have rebutted Officer Nyman's statement that Linney had not been beaten during the 2012 arrest). Linney asserts that the injuries in the photographs would substantiate his testimony that he acted in fear of another beating while harassing Officer Nyman. *Id.* at 11, 14. Linney claims that he did not act with the required intent to harass, annoy, or alarm, and that he should be awarded a new trial. *Id.* at 14.

The trial court set forth the relevant law, addressed Linney's first claim, and determined that it is without merit. *See* Trial Court Opinion, 7/7/17, at 16-18. Upon review, we agree with the trial court's reasoning and adopt the Opinion rejecting Linney's claim for the purpose of this appeal. *See id.*

In his second claim, Linney contends that the evidence was insufficient to support his harassment conviction. Brief for Appellant at 15. Linney

argues that the evidence did not establish an intent to harass, annoy, or alarm Officer Nyman. ***Id.*** Linney asserts that "transitory anger" or "spur-of-the-moment anger" negates specific intent. ***Id.*** at 17, 18. Linney claims that because he was handcuffed, alone and defenseless in the patrol car, with an officer he believed had previously beaten him, Linney's actions did not demonstrate he intended to harass Officer Nyman. ***Id.*** at 17-18.

The trial court set forth the relevant law, addressed Linney's second claim, and determined that it is without merit. ***See*** Trial Court Opinion, 7/7/17, at 12-16. We agree with the sound reasoning of the trial court, and affirm on the basis of the trial court's Opinion. ***See id.***

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/27/18

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA     :     No. CP-46-CR-0006608-2016

                          :

                          :

           v.                   :

                          :     1601 EDA 2017

PAUL LINNEY                      :

## OPINION

**Page, J.**                                                     *July 7, 2017*

Defendant appeals from this Court's Judgement of Sentence on April 14, 2017. For the reasons set forth below, Defendant's appeal is without merit. Therefore, any claim of error on the part of this Court should be dismissed and the ruling should be affirmed.

## FACTS AND PROCEDURAL HISTORY

The Defendant was arrested on August 10, 2016, and charged with DUI-General Impairment, DUI-Highest Rate, Harassment, Disorderly Conduct, and Terroristic Threats. The Commonwealth alleged that the Defendant was driving while intoxicated and that while police transported the Defendant to the hospital he began to use obscenity and threaten the safety of the officers.

At trial, the 911 dispatcher, Lisa Bickhart, testified that she received an emergency call on August 10, 2016 around 6:20 PM from Stephanie Mata who described witnessing a driver who appeared to be falling asleep and swerving back and forth. N.T. Trial 4/13/17 p. 98-99. She notified dispatchers that the car had pulled into the business parking lot "Ideal Image," and the driver's head was slouched over. *Id.* at 99. Thereafter, she continued driving. *Id.*

A    1

Officer Andrew Ammaturo testified that he had worked for the Abington Police Department for three and a half years. *Id.* at 101. During that time, he had encountered approximately 100 people under the influence of alcohol and the same amount of people in his personal life. *Id.* at 102. Officer Ammaturo was dispatched for a call about a reckless driver, and when Officer Ammaturo arrived on scene he found a green Mercury Mountaineer parked diagonally across two parking spaces in the Ideal Image parking lot. *Id.* at 103. He observed the Defendant in the driver's seat as the sole occupant. *Id.* The car was still running when the Officer approached, and the Defendant told the officer his swerving was due to his attempt to roll cigarettes while driving. *Id.* at 104. At that point, the officer noticed that the Defendant had slurred speech and a strong odor of alcohol on his breath. *Id.* at 104.

Officer Nyman arrived on scene and it was decided that Officer Nyman would make the report because it was roll change and Officer Nyman covers the time when other officers are switching between day and night shift. *Id.* at 105. The Defendant did not successfully complete the field sobriety tests he was asked to perform, so officers handcuffed him and placed him in the rear of Officer Nyman's vehicle. *Id.* at 106. Officer Ammaturo felt, based on his observations and experience, that the Defendant was unable to safely drive the vehicle. *Id.* Officer Ammaturo's dash cam video was admitted, and played for the jury. *Id.* at 107-08. The video depicts the Defendant attempting the walk and turn test and the one-leg stand test. *Id.* at 109-10. The officer testified that the officers determined the Defendant had failed the field sobriety tests. *Id.* at 110.

Officer Nyman testified that he had been an Abington Township Police Officer for twelve and a half years. *Id.* at 118. On August 10, 2016, he was dispatched to the Ideal Image parking lot, and on arrival he saw the Defendant and Officer Ammaturo. *Id.* at 119. Officer

Ammaturo already had the license of the Defendant and indicated he felt the driver of the vehicle was intoxicated. *Id.* Officer Nyman recognized the Defendant when he approached the vehicle. *Id.* He asked the Defendant to get out of the car, and noticed the smell of alcohol on the Defendant's breath and slurred speech. *Id.* at 120. Officer Nyman had conducted around 200-300 field sobriety tests in his career, and had the Defendant perform the Walk and Turn Test and One Foot Balancing test. *Id.* at 121. The Defendant did not satisfactorily perform any field sobriety test. *Id.* at 122. He was unable to walk heel to toe, couldn't maintain his balance, and stepped off the line he was walking on. *Id.* at 125. On the One Leg Stand test, the Defendant swayed, raised his arms for balance when instructed to leave his arms at his side, put his foot down, and hopped to keep his balance. *Id.* The Defendant then submitted to a blood draw within 2 hours. *Id.* There was stipulation that the blood was taken from the Defendant at Holy Redeemer Hospital on August 10, 2016 at 7:36 PM and delivered to the National Medical Services Lab on August 11, 2016. *Id.* at 128. The blood results were stipulated to in the form of a report prepared by Donna Papsun. *Id.* at 129. The Defendant's blood alcohol concentration was .25. *Id.* at 130. The lab report stated that "based on the concentration of ethyl alcohol found in this case, it can be stated with reasonable scientific certainty that at and around the time of specimen collection, the subject's alertness, judgment, perception, coordination, response time, and sense of care and caution were impaired rendering the individual unfit to operate a motor vehicle safely." *Id.* at 131.

Officer Nyman briefly discussed a prior incident in 2012, where he was the affiant in a case where another officer was the alleged victim of aggravated assault by the Defendant. *Id.* Officer Nyman was at the neighbor's house at the time of the alleged assault. *Id.* at 131-32. The

officer testified that he didn't threaten or injure the Defendant during that case and that until this incident he hadn't seen the Defendant again. *Id.* at 132.

The officer had the cameras in the vehicle recording during the transport of the Defendant. *Id.* at 133. Officer Nyman testified that the Defendant was initially agitated, and asked for the officer's name. *Id.* When the officer identified himself to the Defendant, the Defendant said "you better check my fucking record, buddy. You don't want to mess we (sic) me, stupid ass." *Id.* The Defendant said "you're the same motherfucker that arrested me" and "I know everything about you. I know where you live. You live in a tan-colored townhouse right over the railroad tracks." *Id.* at 134. He further elaborated, "I know where you live. I can get you anytime. [...] Right over those railroad tracks, the second townhouse on the right. I know where you live. I can get you anytime." *Id.* at 135. That description very accurately matched Officer Nyman's home that he had just moved away from after 6 years. *Id.* at 135-36.

The Defendant also said, "If you fuck with me, I'm going to fuck with you." *Id.* at 137. Officer Nyman asked if the Defendant was threatening him, and the Defendant said he wasn't and continued to make comments telling the officer that "somebody was going to kill [him], that somebody should put a bullet in [his] fucking head, that it wasn't going to be him, but somebody is going to put a bullet in [his] fucking head." *Id at 137;* N.T. Trial 4/14/17 p. 24. The Defendant also was concerned they weren't taking a normal route to the hospital, and he questioned the officer about that and said things like "Why don't you take these handcuffs off and I'll show you something." N.T. Trial 4/13/17 p. 137.

Officer Nyman requested a supervisor respond to the hospital and the Defendant continued talking to the officer saying "you're a piece of shit. You should be fucking eradicated." *Id.* at 138. Based on Mr. Linney's request for medical treatment, his care was

transferred to the hospital. *Id.* at 139. The Defendant had sores on both arms with bandages, and one of the sores was open which the Defendant felt was caused by the handcuffs. *Id.* The Officer did not believe the injury was from the handcuffs. *Id.* Eventually, a picture of the wrist injuries were taken at the Defendant's request. N.T. Trial 4/14/17 p. 27-28. These pictures were marked D-1, D-2, and D-3 and shown to the jury. *Id.* at 28-29. The officer noted the Defendant had multiple sores on his arms, and there was a small laceration on the Defendant's left arm that was inflamed and there were no other injuries like it. *Id.* at 30-31. The injury was in the area where the handcuffs would be, and the Defendant had complained the handcuffs were too tight. *Id.* at 32. However, Officer Nyman testified that he and Sergeant Porter checked them when they arrived at the hospital and the handcuffs were not too tight. *Id.* The Defendant also complained about the police car not being air conditioned, but the officer testified the car was air conditioned because it was August and hot. *Id.* at 42.

The video from the Officer Nyman's car was entered into evidence and shown to the jury. N.T. Trial 4/13/17 p. 140. The first 30 seconds of the video lack audio because the audio does not turn on until that point. *Id.* at 142. Officer Nyman also testified that he was able to hear the threats better in person because the audio recorder in his shirt had a harder time picking up sound in the back seat than he did in person. *Id.* at 144.

After the incident at the hospital, the officer was concerned about why the Defendant knew where he and his family lived. *Id.* at 145. The comments made by the Defendant started to bother Officer Nyman a few hours later when he had a chance to think about the encounter. N.T. Trial 4/14/17 p. 19-20. The police staked out the officer's home to be sure he was safe after the incident. *Id.* at p. 47. However, the officer never saw the Defendant at his residence, and the Defendant did not mention the officer having a wife and children. *Id.* at 22.

On cross, the defense discussed the prior 2012 case, and how the Defendant felt the officer was "the same officer who beat him up in 2012." *Id.* at 15. Officer Nyman was the affiant in that case, and the Defendant during that incident was taken to the ground by police or fell to the ground. *Id.* at 17-19. However, the officer testified that he only had contact with the Defendant after he was on the ground, and the other officer asked for help. *Id.* Officer Nyman called for an ambulance in that case because the Defendant had cuts above his eye and on his lip that were bleeding, and stayed in the hospital with the Defendant for a time. *Id.* at 40-41. Officer Nyman stayed until the hospital paralyzed and intubated the Defendant because he was so intoxicated and irate. *Id.* at 20.

The Defendant mentioned that Officer Nyman "beat him up" several times, and Officer Nyman said the Defendant was a liar. *Id.* at 19. The Defense asked the officer about the Defendant stating "I didn't pursue a lawsuit," but the officer had never heard of that before or ever had a complaint lodged against him. *Id.* at 23.

Sergeant Porter testified that he is a Sergeant at the Abington Police Department where he had worked for the past 25 years. *Id.* at 50. He responded to Holy Redeemer at Officer Nyman's request, and arrived to see the Defendant "spewing a lot of profanities." *Id.* at 50-51. The Defendant's first question to Sergeant Porter was "who the fuck are you?" *Id.* at 51. The Defendant was very angry with Officer Nyman, and initially angry with Sergeant Porter. *Id.* at 52. The Defendant calmed down approximately an hour later, and had a conversation with the Sergeant. *Id.* Officer Nyman had to leave the room because every time the Defendant saw him he began his profanity again. *Id.* at 54. Officer Porter testified that the Defendant complained the handcuffs were too tight, but said they were adjusted correctly. *Id.* at 57. He also said the Defendant was out of control, and his job was to calm the situation down so he loosened the

A 6

handcuffs very slightly. *Id.* He testified that the Defendant had a little blood on one wrist where the handcuff was, and it looked like a piece of skin almost like a blister that had worn away. *Id.* There were several more sores on his arm. *Id.*

The Defense argued that the Police Officer opened the door to the photo of the Defendant's injuries from the 2012 incident, and argued that the photos relate to the sequence of events that made the Defendant so focused on Officer Nyman. *Id.* at 65. They also argued that the photo would put the Defendant's statements into context. *Id.* The Commonwealth argued that the officer did not open the door, but merely responded to a question by the Defense. *Id.* The Commonwealth also argued that the photo would permit a retrying of the 2012 case, and that the Defense had already been permitted to discuss the incident and it's relation to this case. *Id.* at 66. This Court did not permit the photo to be shown to the jury, but allowed the defense to address it as they already had and through cross-examination. *Id.*

The Defense made a motion for a judgment of acquittal after the Commonwealth rested, and this Court granted that motion as to the disorderly conduct charge. *Id.* at 67-70. The Defendant was colloquied regarding his desire to testify, and his understanding that he had the right not to testify and it could not be held against him if he didn't take the stand. *Id.* at 71-72.

This Court ruled on the Commonwealth's Motion in Limine to exclude evidence of the 2012 incident prior to trial. N.T. Trial 4/13/17 p. 9-14. The motion was denied in part, and -this Court ruled that testimony regarding the 2012 incident would to be limited to the basic facts of the case like the charges and the outcome of the case. *Id.* This Court also deferred a ruling on whether the photograph of the Defendant's alleged injuries in 2012 would be admitted until after the tape of the police ride to the hospital was played. *Id.* The Defendant was allowed to testify

A 7

about the 2012 case to the same extent as the motion in limine, but the Court would rule on the issue of what evidence was permitted when objections arose. N.T. Trial 4/14/17 p. 74.

Mr. Linney testified that he was 61 years old, and was from Texas. *Id.* at 80. Mr. Linney testified that on August 10, 2016, he was intoxicated and driving under the influence of alcohol.[1] *Id.* at 80. He testified that he didn't have a problem with the arrest or beginning of the car ride because he knew he had been drinking. *Id.* However, he felt he recognized the officer, and once he learned the name of Officer Nyman, he remembered what happened four years before. *Id.* at 81. He also testified that the impact was more severe because he was drunk. *Id.* He said the officer was driving through "cow pastures that has barbwire," the air conditioning wasn't working, and the "cuffs were too tight." *Id.* The Defendant testified that he remembered the 2012 incident where he was charged with aggravated assault and acquitted by the jury of all charges. *Id.* at 82. The Defendant testified that in 2012, "a son I shared with my fiancée, called the police and told them [...] to come out and check on their mother; they was worried about their mother. And so Officer Nyman and about three or four other squad cars pull up. Before the evening was through, Officer Nyman had gone next door, that is correct in what he testified. The only difference is that Officer Farris stayed with me in the house in the entryway. I had already repeatedly asked them to leave. They had no grounds to remain there. I told them that I knew my legal rights, and, of course, I remember him specifically laughing at me in the house." *Id.* at 83-84. The Defendant said he was talking about Officer Nyman and all the officers laughed together, but "he was the biggest one, the buffiest, the meanest looking one so, you know, I paid attention to it." *Id.* at 84.

---

[1] Question: All right. Now, Mr. Linney, let's get right to it. August 10th, 2016, you were intoxicated, correct?
Answer: That's correct.
Question: And you're not disputing that you were driving under the influence of alcohol?
Answer: I'm not disputing that at all. *Id.* at 80.

A 8

The Defendant then testified that he believed "Officer Nyman came back toward my house in the front door, and I was standing outside when I saw him walk up beside me in the driveway. And Officer Farris is standing behind me in the entryway of the house where there's a glass storm door that's closed. And Officer Nyman walked up to me and says, you need to go back into the house. And I said, well, I'm trying to find Sharon to get this matter straightened out so you all can leave." *Id.* at 84-85. The Defendant testified Officer Nyman didn't like that, and ordered him inside. *Id.* at 85. The Defendant says he went inside and told the police to leave. *Id.* When he went to close the door, he says the door slammed and hit Officer Nyman's boot. *Id.*

The Defendant testified he was Tased, but "Officer Nyman took a Taser and did something to it to result in what's called a dry Taser. That's where they don't have to report that they've used it because they can do it two, three times." *Id.* The Defendant claims he was Tased in his palm and had "veins that were running out from a shock burn." *Id.* at 86. The Defendant testified the Taser rendered him unconscious, and when he came to, Officer Nyman was "holding me by my hair; I was handcuffed behind my back. He had my head in the door jam, and he was kicking the plate glass storm door window open with his foot. He was standing on this side of me. I couldn't see him, but I could see Officer Farris. And Officer Farris is watching him, and he's kicking the storm door, and it's slamming real fast and it's cutting my face up, and I've got cuts and stitches I had to have done where he had ran that door into my face. And every time it would hit me, he would say, oh, excuse me. And that was the way I came to after having been rendered unconscious. And this happened at least three times, maybe four." *Id.* at 86. The Defendant next claimed that in the 2012 incident "he grabbed the back side of my black leather jacket, and he either grabbed me by the seat of my pants or by my arms that were handcuffed and literally threw me out the front door. My head landed eight to ten foot away from the door." *Id.*

A9

at 87. The Defendant claimed that "he twisted, Officer Nyman twisted the story so bad that he tried to make his partner that was there, Officer Farris, who was a nice man, he tried to make him his fall partner I guess because he probably didn't have as much time on the force. And I see that he's doing the same thing in this case." *Id.* at 87.

In this case, the Defendant testified that he remembered everything he had just told the jury about the 2012 incident while in the police car, and he got angry. *Id.* at 88. Mr. Linney believed that the police had been at his house earlier that day. *Id.* at 88-90. The Defendant felt Officer Nyman "clearly" was part of the police who were at his home and had followed him. *Id.* at 91. The Defendant admitted he was highly intoxicated and his thinking process "was not entirely correct." *Id.* at 91. The Defendant testified he knew where the officer lived because he wanted to avoid him, so he searched online and found a map with an aerial view of the house. *Id.* at 93-94. The Defendant said he then stopped using the road by the officer's house. *Id.* at 94-95. The Defendant claimed he made the statement about knowing where the officer lived to make the point that they are no different and each knew where the other lived. *Id.* at 95. He also testified "everything I said to Mr. Nyman was indicating civil litigation more or less, to where the—to where he (sic) understanding that he could be served too, you know." *Id.* The Defendant also testified that his comment that "someone would put a bullet in him" was a reference to the political climate where officers were "shooting people and abusing the law and operating outside of the color and the intent of the law." *Id.* at 95-96.

The Defendant testified that he was regretful for what he called the officer, but that he never intended to threaten Officer Nyman's safety or his family's safety. *Id.* at 100. The Defendant also said the handcuffs were too tight and believed the pictures show a crease where the handcuffs were placed. *Id.* at 102. The Defendant testified on cross that he believed Officer

A10

Farris's testimony at the 2012 trial was "incorrect" and that it wasn't Officer Farris whose boot was jammed in the door, but Officer Nyman's boot. *Id.* at 105. He claimed Officer Nyman followed him around the hospital and was "always covering his basis (sic) because he's got to be present in order to influence everyone that has anything to do with me or the situation, and so that he has all absolute knowledge so that he can manipulate it, and that's clearly what he was doing and has done many times." *Id.* at 105. The Defendant claimed that when he said Officer Nyman was asking for trouble, he meant legal trouble. *Id.* at 109. The Defendant also claimed that when he said "take the handcuffs off, I'll show you something" he meant it was going to be an attempted suicide by him. *Id.* at 110. He also claimed that when he said the officer should be "eradicated" he meant "removed from authority." *Id.* Finally, the Defendant also testified that his statement about barbequing the officer meant civil litigation, and is a common term in Texas for defeating someone. *Id.* at 110-11.

On April 14, 2017, the jury found the Defendant guilty of DUI-General Impairment, DUI-Highest Rate, and Harassment. The jury found the Defendant not guilty of terroristic threats. The Defendant requested that sentencing proceed immediately. The Guideline range sentence for harassment was a minimum 3 to 6 months in the standard range, and 3 months for the DUI. Officer Nyman testified that this case made him consider the risk the job posed to his family by an individual who clearly disliked the officer and knew where he lived. The threats also upset his family, particularly in light of the criminal history of the Defendant which was known to the officer. On the same day, this Court sentenced the Defendant to 6-12 months incarceration for the Harassment charge, and a consecutive 3-6 months incarceration on DUI-Highest Rate plus a $1,000 fine. The DUI-General Impairment charge merged for sentencing. The Defendant also received credit from 8/12/16-4/14/17. On April 24, 2017, a Post-Sentence

Motion was filed challenging the weight and sufficiency of the evidence as well as alleging the sentence was excessive and imposed without sufficient reasons on the record. On April 26, 2017, this Court denied Defendant's Post-Sentence Motion. On May 19, 2017, the Defendant filed a timely Notice of Appeal.

## ISSUES

Defendant's Concise Statement, received in chambers on June 27, 2017, raises the following issues:

1. The evidence was insufficient to make out the necessary elements of the crime of harassment, where the evidence did not establish that Appellant engaged in any of the behaviors proscribed by 18 Pa.C.S. § 2709 with the intent to harass, annoy or alarm the complainant.
2. The court erroneously precluded the defense from introducing a photograph depicting Appellant's injures after his 2012 arrest. The photo was probative of Officer Nyman's credibility, where the officer testified that Appellant merely sustained scratches during that arrest, The true extent of Appellant's prior injuries was also relevant to explain Appellant's state of mind at the time of his 2016 arrest. The true extent of Appellant's prior injuries was also relevant to substantiate Appellant's testimony that he acted out of fear and anger but without a specific intent to harass, annoy or alarm the complainant during the 2016 ride to the hospital.
3. The trial court erroneously excluded a letter written by Appellant to the arresting officer after his 2016 arrest but before his 2017 trial. The letter was probative of Appellant's intent at the time that Appellant employed the language in issue during the 2016 ride to the hospital.

## ANALYSIS

### I.   Sufficiency of the Evidence

Whether sufficient evidence exists to support the verdict is a question of law; an appellate Court's standard of review is *de novo* and their scope of review is plenary. *Commonwealth v. Walls*, 144 A.3d 926, 931 (Pa. Super. 2016) (citation omitted). When reviewing challenges to the sufficiency of the evidence, appellate courts evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving the prosecution the benefit of all reasonable

A 12

inferences to be drawn from the evidence. *Commonwealth v. Duncan*, 932 A.2d 226, 231 (Pa.Super.2007) (citation omitted). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Id.* (quoting *Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa.Super.2005)).

However, the Commonwealth need not establish guilt to a mathematical certainty, and it may sustain its burden by means of wholly circumstantial evidence. *Id.* In addition, the appellate court may not substitute its judgment for that of the factfinder, and where the record contains support for the convictions, they may not be disturbed. *Id.* Lastly, the finder of fact is free to believe some, all, or none of the evidence presented. *Commonwealth v. Hartle*, 894 A.2d 800, 804 (Pa.Super.2006). *Commonwealth v. Smith*, 2016 PA Super 187, 146 A.3d 257, 261–62 (Pa. Super. Ct. 2016). Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Com. v. Mucci*, 2016 PA Super 137, 143 A.3d 399, 409 (Pa. Super. Ct. 2016), reargument denied (Aug. 31, 2016).

To be found guilty of harassment under section 18 Pa.C.S.A. § 2709 (a) (4), the Commonwealth must prove two elements: 1) that with intent to harass, annoy or alarm another, the person 2) communicate[s] to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures. 18 Pa.C.S.A. § 2709 (a) (4). Intent may be inferred from the totality of the circumstances. *Commonwealth v. Beck*, 295 Pa.Super. 154, 159, 441 A.2d 395, 398 (1982).

The Defendant claims there was insufficient evidence to show he engaged in any of the proscribed behaviors under § 2709 (a) (4), and that he lacked the requisite intent to harass,

A 13

annoy, or alarm. However, there was more than sufficient evidence to find the Commonwealth had proved each element beyond a reasonable doubt.

The Defendant told Officer Nyman "you better check my fucking record, buddy. You don't want to mess we (sic) me, stupid ass," "I know everything about you. I know where you live. You live in a tan-colored townhouse right over the railroad tracks. I know where you live. I can get you anytime. [...] Right over those railroad tracks, the second townhouse on the right. I know where you live. I can get you anytime." *N.T. Trial 4/13/17* p 135. The Defendant also told Officer Nyman "somebody was going to kill [him], that somebody should put a bullet in [his] fucking head, that it wasn't going to be him, but somebody is going to put a bullet in [his] fucking head" *Id* at 137; N.T. Trial 4/14/17 p. 24. Finally, the Defendant also said things like "why don't you take these handcuffs off and I'll show you something" and "you're a piece of shit. You should be fucking eradicated." N.T. Trial 4/13/17 p. 137- 38.

Although the Defendant claimed that he meant something other than a threat for each comment he made, the jury was free to disbelieve the Defendant, and find that each remark communicated to the officer was threatening. Telling someone exactly where they live, saying someone would put a bullet in his head, that the officer should be "eradicated," and that if Officer Nyman took off the handcuffs, the Defendant would "show [him] something" are all threatening statements. While the statements could theoretically have other meanings like those the Defendant claimed he meant, it is not unreasonable for the jury to have concluded that these statements mean what they say, and that the Defendant was threatening Officer Nyman.

The Commonwealth also had to prove the Defendant intended to harass, annoy, or alarm Officer Nyman. Again, the jury could reasonably believe that explaining to someone exactly where they live, and then telling him that "someone would put a bullet" in him and that he

A 14

"should be fucking eradicated" was meant to threaten and alarm the officer. *See Commonwealth v. Walls*, 2016 PA Super 156, 144 A.3d 926, 938 (Pa. Super. Ct. 2016), *reargument denied* (Sept. 22, 2016), *appeal denied sub nom. Commonwealth v. Walls*, 470 EAL 2016, 2017 WL 721824 (Pa. Feb. 23, 2017) (yelling at an Assistant District Attorney that she caused the death of the defendant's grandmother and that she would be next was sufficient to establish intent to harass. "Unless you are attempting to harass and annoy an individual, there is no reason to scream at someone that she should die."); *Commonwealth v. Tedesco, 379 Pa.Super. 567, 574, 550 A.2d 796, 800 (1988)* (tirade including racial and ethnic slurs toward both the victim and the victim's wife using extremely vulgar language annoyed the victims sufficient to sustain harassment conviction); *Commonwealth v. Lutes*, 2002 PA Super 51, ¶ 29, 793 A.2d 949, 961 (Pa. Super. Ct. 2002) (poking the victim in the chest, calling him a "p*ssy," saying "that he would take the victim around the corner and beat him," and threatening to punch the victim in the mouth was evidence of intent to harass, annoy, or alarm the victim.)

While the Defendant gave an alternative explanation, the jury was free to disregard that, and believe that the Defendant was angry and wanted to alarm the officer with his knowledge of where Officer Nyman lived, and that he should be shot and eradicated. Additionally, the Defendant kept up a tirade of threats and profanity throughout the 10 minute car ride and for over an hour at the hospital. The repeated threats and profanity for that sustained period of time can have no other purpose than to annoy or harass. *See Commonwealth v. Walls*, 2016 PA Super 156, 144 A.3d 926, 938 (Pa. Super. Ct. 2016), The Defendant was not sharing new information with the officers; he was just repeating profanity and threats over and over again. The jury could have reasonably found the Defendant made threats and swore at Officer Nyman for more than an hour to annoy or harass him.

The Commonwealth had made out each element of harassment, and the jury was free to believe Officer Nyman and the video over the Defendant's statements. Because the Commonwealth has met its burden with sufficient evidence for each element of the harassment charge, this claim is without merit.

## II.    Preclusion of evidence

Rulings on the admissibility of evidence are within the discretion of the trial judge, and such rulings form no basis for a grant of appellate relief absent an abuse of discretion. *Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 550 (2002). "An abuse of discretion may not be found merely because an Appellate Court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Sherwood,* 603 Pa. 92, 982 A.2d 483, 495 (2009) (quoting *Commonwealth v. Dillon,* 592 Pa. 351, 925 A.2d 131, 136 (2007) (citation omitted)).

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Pa.R.E. 401. All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible. Pa.R.E. 402. The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Pa.R.E. 403. "Unfair prejudice" means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially. Pa.R.E. 403 Cmt.

A16

### a. Photograph of Injures

First, the Defendant challenges the exclusion of a photograph depicting the Defendant's injuries from the 2012 arrest. The Defendant claims that the "true nature" of his injuries was relevant to his intent and state of mind. This Court permitted the Defendant to testify as to his version of the events that happened in 2012 at length. This Court also permitted the Defense to cross-examine the officer about the 2012 incident. This Court only excluded the photograph from that incident. While the incident in 2012 was probative of the Defendant's state of mind, and his intent, the picture of his claimed injuries was too prejudicial and outweighed any probative value.

Allowing the picture to be shown to the jury would have diverted the jury's attention away from the instant case. Were the picture shown to the jury, it would have required extensive questioning and witnesses to establish whether the photo fairly depicted the injuries from that night, who caused the injuries, when the injuries occurred, and a myriad of other details about the 2012 case.[2] To allow the picture would have been to permit a retrying of issues in the 2012 case while diverting attention away from the instant offense. The danger of the jury confusing the issues in this case was too great to allow the photo to be shown, particularly in light of the extensive testimony this Court had already allowed on the 2012 incident to explain the Defendant's state of mind.

The photo also was not probative of the officer's credibility. The seriousness of the injuries was a matter of interpretation, and Officer Nyman believing the injuries weren't serious did not mean he was lying about the incident. His feeling that a few cuts on the face were not serious is

---

[2] The Officer in this case testified that he only appeared at the scene when the Defendant was already on the ground and struggling. Officer Nyman maintained that any injuries occurred before he arrived or from the Defendant struggling while being arrested. This Court would have needed to allow testimony regarding who was responsible for the injuries if the Defendant had been permitted to show the 2012 photograph to the jury.

A17

not a matter of fact, but of the personal perception of the officer regarding what constitutes serious injuries. Most importantly, the pictures were too collateral to overcome their unfair prejudice. The pictures were evidence for another case, and did not have any relevance as to whether the Defendant was threatening the officer in this case, or whether he intended to harass, annoy, or alarm Officer Nyman. The Defendant explained his perception of the events in 2012, how he believed those events influenced his drunken rage, and what he claimed to mean when he threatened Officer Nyman. The photos would only be an attempt to prove or disprove the events in 2012. Because the photos probative value was low in light of the testimony regarding the prior case, and the potential for unfair prejudice was high, this evidence was properly excluded.

### b. Letter from the Defendant

Finally, the Defendant argues that it was error to exclude a letter written by the Defendant to Officer Nyman after the 2016 arrest, but before trial. Defendant argued that the letter was probative of the intent behind his statement while in the police car. However, regardless of whether the evidence was probative, it also had to be admissible. This evidence was hearsay without an exception, and therefore inadmissible.

Hearsay is "a statement that(1) the declarant does not make while testifying at the current trial or hearing; and(2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801. An opposing party's statement is an exception to the hearsay rule if the "statement is offered against an opposing party and was made by the party in an individual or representative capacity." Pa.R.E. 803 (25).

At trial, the Defense argued that the letter was not offered for the truth of the matter asserted, or that it was an opposing party statement. In his concise statement, Defendant argues the letter should have been admitted because it was probative. However, even if the letter was probative, it

A 18

was still inadmissible hearsay. The statement was offered to prove the Defendant's intent. *See* N.T. 4/14/17 p. 98. The Defendant's intent is an element of the harassment charge; therefore, it was being offered to prove the truth of the matter asserted and is inadmissible hearsay unless it falls under an exception. It does not. Statements made by a Defendant are admissible under the Party Opponent rule if they are offered by an opposing party. The Defendant is not an opposing party to the defense, and the Defendant's statements are not admissible under that exception. Further, the Defendant was on the stand, and he could testify as to what his intent was without reading a letter he wrote out of court when he wasn't under oath and subject to cross-examination.

Because the Defendant could still testify directly to anything he had also said in the letter, subject to cross-examination, the Defendant was not precluded from introducing any evidence other than an out of court letter which would bolster his claim. The statement was inadmissible hearsay, and regardless of how probative it might have been, was not admissible. This Court properly excluded the letter, and this claim is meritless.

## CONCLUSION

For all of the aforementioned reasons, this Court's decision and order should be **AFFIRMED**.

BY THE COURT:

_____
GARRETT D. PAGE,      J.

Copies of the above Opinion
Mailed on 7-7-17
By Interoffice Mail to:
Robert Falin, Esq., ADA
Raymond Roberts, Esq., PD
Anne Schools – Court Administration
By First Class Mail to:
Paul Linney, Defendant

_____
Judicial Secretary

A 19